FILED

2010 Nov-17  PM 12:11
U.S. DISTRICT COURT
N.D. OF ALABAMA



# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

FIDELITY & DEPOSIT COMPANY )
OF MARYLAND,

                         )

     PLAINTIFF,

                         )

VS.                                  2:09-cv-247-JHH

                         )

JEFFERSON COUNTY
COMMISSION,                  )

     DEFENDANT.          )

## MEMORANDUM OF DECISION

The court has before it two motions for summary judgment.  The first is the July 6, 2010 motion (doc. # 24) of Plaintiff/Counterclaim Defendant Fidelity & Deposit Company of Maryland ("F&D") for judgment as a matter of law, or in the alternative for summary judgment.  The second is the July 7, 2010 motion (doc. #25) of Defendant/Counterclaim Plaintiff the Jefferson County Commission ("JCC") for summary judgment.  Pursuant to the court's July 7, 2010, July 13, 2010, August 12, 2010 and August 26, 2010 orders[1] (docs. # 26, 28, 34 & 36), the motions were deemed submitted, without oral argument, on September 1, 2010.  After careful

---

[1] On multiple motions from the parties, the court granted numerous extensions to the briefing schedule originally entered by the court.

consideration of the briefs and admissible evidence, the motion (doc. #24) for summary judgment filed by F&D is due to be granted in full, and the motion (doc. #25) for summary judgment filed by the JCC is due to be denied for the following reasons.

## I. Procedural History

Plaintiff F&D commenced this action on February 6, 2009 by filing a declaratory judgment complaint in this court. Specifically, the complaint asks the court to determine the liability of F&D, if any, on a Performance Bond issued on behalf of Elevator Maintenance and Repair, Inc. ("EMR"), with respect to a project for the installation of a new elevator system at the Bessemer Courthouse. (*See* Compl., Doc. #1.) Along with its Answer (doc. # 8), the JCC filed a Counterclaim, alleging breach of contract. (*Id.*) The JCC contends that F&D "breached their contract by breaching the implied covenant of good faith" and fair dealing. (Doc. #25 at ¶ 3.)

Both parties have filed briefs and submitted evidence in support of their respective positions. F&D filed a brief (doc. #29) and evidence[2] (doc. #30) in support

---

[2] F&D submitted the following evidence in support of summary judgment: the performance bond; contract between JCC and EMR; minutes from meeting regarding potential declaration of default by EMR; August 29, 2008 Notice of Termination Letter from Brice Building Company; Letter of September 26, 2008; proposed Takeover Agreement; affidavit of Paul Eaves; deposition of Jeffrey Smith; and Giattina Aycock Architecture Studio letter of August 28, 32008.

of its own motion for summary judgment on August 4, 2010.  On August 26, 2010, the JCC filed a brief (doc. # 37) and evidence[3] (doc. #38) in opposition to F&D's motion for summary judgment.  On September 1, 2010, F&D filed a reply brief and evidence[4] (doc. #40) to the JCC's opposition to summary judgment.

Similarly, on August 4, 2010, the JCC submitted a brief (doc. # 31) and evidence[5] (doc. # 32) in support of its own motion for summary judgment.  On August 25, 2010, F&D filed a brief (doc. # 35) in opposition to the JCC's motion for summary judgment.  On September 1, 2010, the JCC filed a brief (doc. # 39) in reply to F&D's opposition to its summary judgment motion.

Additionally, on September 23, 2010, F&D filed a motion (doc. #41) to strike the affidavit of Jeffrey Smith, which was filed by the JCC in opposition to F&D's motion for summary judgment.  Pursuant to the court's October 19, 2010 order (doc. #42), the JCC filed a response (doc. # 43) to the motion to strike on November 2, 2010, and F&D filed a reply (doc. # 44) on November 8, 2010.  The motion (doc.

---

[3] The JCC submitted the following evidence in opposition: general conditions of the Contract for Construction; and affidavit of Jeffrey Smith, with attachments.

[4] F&D submitted the following evidence in reply: affidavit of Lin Heath, with attachments.

[5] The JCC submitted the following evidence in support of its motion for summary judgment: affidavit of Dan Price, with attachments; and affidavit of Charles S. Wagner, with attachments.

#41) to strike is **MOOT**, however, as the court does not need to decide the issue presented to make its determination as to the pending summary judgment motions.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *See id.* at 323. Once the moving party has met its burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and by its own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial. See id. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor

of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  *See id.* at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial.  *See Fitzpatrick*, 2 F.3d at 1115-17 (citing *United States v. Four Parcels of Real Property*, 941 F.2d 1428 (11th Cir. 1991) (*en banc*)).  If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial.  *See Fitzpatrick*, 2 F.3d at 1115.  Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party

5

satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  *See Fitzpatrick*, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  *See Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts

The material facts are not in dispute.[6]  The JCC is the elected commission of Jefferson County, Alabama, a political subdivision of the State of Alabama, (doc. #31 at 3) and the owner of the Bessemer Courthouse and Jail located in Jefferson County, Alabama.  (Doc. #8 at 7.)  On August 29, 2007, the JCC contracted with EMR to design and install a new elevator system for the Bessemer Courthouse Expansion Project  (hereinafter "the Project").  (*See* Compl. ¶ 2; Answer & Countercl. ¶ 2).

Prior to construction, F&D, as surety, issued a Performance Bond for the Project on behalf of EMR.  (Compl. ¶ 3; Answer & Countercl. ¶ 3; *see also* Pl.'s Exhs A & B.)  EMR was required by Alabama law to obtain this bond  to work on a government owned project.  *See* Ala. Code § 39-1-1.  The purpose of the performance bond on a public works project is to give the owner, the JCC, protection in the event

---

[6]   These are the facts for summary judgment purposes only.  They may not be the actual facts.  *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994) ("'[W]hat we state as 'facts' in this opinion for purposes of reviewing the rulings on the summary judgment motion [ ] may not be the actual facts'") (citation omitted).

Although there are cross-motions for summary judgment, each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See Chambers & Co. v. Equitable Life Assur. Soc. of the U.S.*, 224 F.2d 338, 345 (5th Cir. 1955); *Matter of Lanting*, 198 B.R. 817, 820 (Bankr. N.D. Ala. 1996).  The court will consider each motion independently, and in accordance with the Rule 56 standard.  *See Matsushita Elec. Indus. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  "The fact that both parties simultaneously are arguing that there is no genuine issue of fact, however, does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."  *See* WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327-28 (3d ed. 1998).

of default by the bonded contractor, EMR.  Paragraph 4 of the Performance Bond

defines F&D's options for performance under the bond in the event of default by

EMR:

> When the Owner has satisfied the conditions of Paragraph 3 [requiring, *inter alia*, notice to the Surety, declaration of Contractor default, and Owner's agreement to pay the Surety the balance of the contract price], the Surety shall promptly and at the Surety's expense take one of the following actions:
>
> 4.1 Arrange for the Contractor, with consent of the Owner, to perform and complete the Construction Contract; or
>
> 4.2 Undertake to perform and complete the construction contract itself, through its agents or through independent contractors; or
>
> 4.3 Obtain bids or negotiated proposals from qualified contractors acceptable to the Owner for a contract for performance and completion of the Construction Contract, arrange for a contract to be prepared for execution by the Owner and the contractor selected with the Owner's concurrence, to be secured with performance and payment bonds executed by a qualified surety equivalent to the bonds issued on the Construction Contract, and pay to the Owner the amount of damages as described in Paragraph 6 in excess of the Balance of the Contract Price incurred by the Owner resulting from the Contractor's default; or
>
> 4.4 Waive its right to perform and complete, arrange for completion, or obtain a new contractor and with reasonable promptness under the circumstances:
>
>> 1. After investigation, determine the amount for which it may be liable to the Owner and, as soon as practicable after the amount is determined, tender payment therefor to the Owner; or
>>
>> 2. Deny liability in whole or in part and notify the Owner citing reasons thereof.

(*See* Pl. Exh. A.)

After construction began, the JCC began having problems with EMR's performance on the Project.  By letter dated June 21, 2008, Brice Building Company, the Construction Manager for the Project, advised EMR that the JCC was considering declaring a default because of alleged scheduling delays and shop drawing deficiencies. (*See* Eaves Aff. ¶ 3.)  The letter requested a meeting to discuss these issues, which Paul Eaves attended on behalf of F&D. (*Id.*)  According to the Meeting Minutes (Pl. Exh. C), Brice's primary concerns were "delinquent submittals and schedule delays."[7]  (*Id.* at 1.)

---

[7] More specifically, Dan Price, the Project Manager, testified that EMR was in default in the following five ways:

- In October of 2007, EMR was unable to mobilize their drilling subcontractor per the project schedule which resulted in a significant delay to the critical path of the project and significant cost to the Concrete Frame Contractor. Also, EMR had no contract with their drilling subcontractor. (*See* Price Aff. at 1.)
- EMR proved to be unable to meet the schedule for Elevator Submittals, including shop drawings and product data which delayed material fabrication and installation. According to the project schedule, the elevator material was to be ordered on or before February 20, 2008; however, at the time of EMR's termination, August 29, 2008, EMR had still not submitted shop drawings that were acceptable to the design team. (*Id.* at 2.)
- EMR had no contract with their elevator supplier, Vertical Express. (*Id.*)
- EMR released equipment for fabrication without approval. (*Id.*)
- On July 25, 2008, EMR began erecting scaffolding to install rails which they were not permitted to do as they were not authorized to install any portion of the work requiring submittal and review of shop drawings, until the respective submittal had been approved by the Construction Manager and Architect. (*Id.*)

According to the JCC and Brice, EMR made no attempt to present a realistic recovery plan based on the concerns of the JCC presented at the meeting. (Price Aff. at 2.) Therefore, on August 29, 2008, Brice notified F&D that the EMR contract was terminated effective September 5, 2008, and on October 1, 2008, the JCC demanded that F&D complete performance under the Performance Bond.[8] (*See* Pl. Exh. D; Compl. ¶ 6; Answer & Countercl. ¶¶ 5-6; Eaves Aff. ¶ 4.)

Upon this demand, F&D began a due diligence investigation of the Project history and allegations of default by the JCC to determine how it should proceed regarding its duties under the Performance Bond.  Paul Eaves, Claim Counsel for Zurich American Insurance Company, the parent entity for F& D, was primarily responsible for the investigation and administration of the JCC claim following termination of the contract.  (Eaves Aff. ¶¶ 1, 5.) His investigation confirmed that EMR vigorously disputed  JCC's action and contentions that EMR breached its contract with the JCC.  (Eaves Aff. ¶ 5.)  According to EMR, Brice was responsible for many of the delays for which EMR was blamed.  (Doc. # 35 ¶ 2.)

Following its duties under the Performance Bond, F&D first attempted to arrange for completion of the Project by EMR pursuant to Section 4.1 of the

---

[8] The JCC contends that F&D delayed its investigation and did not properly fulfil other obligations regarding timing under the terms of the Bond.  (Doc. #31 at ¶¶ 4, 6-8.)  The court finds these contentions not supported by the record.

Performance Bond. (*See id.*; Compl. ¶ 9; Answer & Countercl. ¶ 9.) The JCC, however, rejected the proposal by F&D with respect to direct completion by EMR. (*See id.*)   After this rejection, F&D offered to complete the Project pursuant to Section 4.2 of the Performance Bond. (Compl. ¶ 10; Answer & Countercl. ¶ 10.) Specifically under Section 4.2, F&D proposed a Takeover Agreement wherein F&D would engage W.G. Yates & Sons Construction Company ("Yates") to act as the general contractor for completion of the Project, and F&D would assume primary responsibility for completion in accordance with the plans and specifications. (*See* Pl. Exh. F; Compl. ¶ 10; Answer & Countercl. ¶ 10.)  The JCC rejected F&D's proposal based upon its concern that Yates intended to utilize EMR as a subcontractor, which was an "unacceptable proposition to Jefferson County." (*Id.*)  Additionally, the JCC maintains that another reason for the rejection was because the proposed Takeover Agreement attempted to change many terms of the original construction contract. (Doc. # 31 at 6-7.)  After rejecting F&D's proposal to take over and complete the Project, the JCC retained Mowery Elevator Company ("Mowery") to complete the work originally contracted with EMR. (*See* Compl. ¶ 12; Answer & Countercl. ¶ 12.)

On February 2, 2009, F&D brought the instant action seeking a declaratory judgment that the JCC's refusal to permit F&D to complete the Project was a material breach of the Performance Bond, thus exonerating F&D from any further obligation

under the Bond.  (*See generally* Compl.)  In its Answer to the Complaint, the JCC asserted a Counterclaim against F&D for breach of contract.  (*See generally* Ans.) The Counterclaim seeks recovery from F&D all additional costs and expenses in excess of the original contract balance incurred in the completion process.  (*See* Countercl.)

## IV. Applicable Substantive Law and Analysis

Before the court on the motions for summary judgment are two issues.  The first, contained in F&D's complaint for declaratory judgment, asks the court to determine the liability of F&D, if any, on a Performance Bond issued on behalf of EMR, with respect to a project for the installation of the new elevator system at the Bessemer Courthouse.  Second, the JCC seeks a ruling in its favor on its counterclaim that F&D breached the covenant of good faith and fair dealing.  The court addresses each below.

### A.  F&D's Liability Under the Performance Bond

The question the court must answer is whether the JCC breached the terms of the Performance Bond when it terminated EMR, made a claim under the Bond, but then hired Mowery to complete the Project, instead of permitting F&D to exercise its option and take over the bonded project.   F&D maintains that these actions of the JCC were a material breach of the Bond, thus relieving it of any duties or obligations

12

under the Bond.  (Doc. #29 at 7-10.)  The JCC counters by arguing that it did not breach the Performance Bond because the contract for construction, which was incorporated into the Bond, contained additional, contrary provisions which permitted the actions taken by the JCC.  (Doc. #37 at 4-8.)    Instead, the JCC contends that F&D breached the covenant of good faith and fair dealing "in executing its duty under the 'takeover' provision" when F&D "attempted to rehire EMR through the proverbial 'Trojan horse' of Yates."  (Doc. #37 at 8, 10.)

Fundamentally, this is a contract dispute, and general principles of contract interpretation apply with equal force to surety contracts.  *See Ex parte Lawyers Sur. Corp.*, 719 So.2d 833, 835 (Ala. 1998) (citing *City of Birmingham v. Trammell*, 101 So.2d 259 (1958) and 74 Am.Jur.2d *Suretyship* § 3 (1974)).  In construing the performance bond, it is the duty of the court to ascertain and give effect to the intentions and mutual understandings of the contracting parties.  "When interpreting a contract, a court should give the terms of the agreement their clear and plain meaning and should presume that the parties intended what the terms of the agreement clearly state." *Public Bldg. Auth. of City of Huntsville v. St. Paul Fire and Marine Ins. Co.*, ___ So.3d ___, 2010 WL 3937962, at *8 (Ala. Oct. 8, 2010) (internal citations omitted).  Where there is a written contract, the court looks no further than the four corners of the document to determine the intent of the parties.

13

*See Southland Quality Homes, Inc. v. Williams*, 781 So.2d 949, 953 (Ala. 2000). The court, therefore, must start with the terms of the Performance Bond.

The text of Paragraph 4 of the Performance Bond is unambiguous on the issue before the court.  After the JCC notified F&D of the default of EMR and made a claim under the Bond, the Bond gave F&D four ways to proceed.  First, under Paragraph 4.1, F&D could arrange for completion of the Project by EMR with the consent of the JCC.  (Pl. Exh. A ¶ 4.1.)  F&D attempted to use this route first, but the JCC would not give its consent.  (*See* Compl. ¶¶ 8- 9; Answer & Countercl. ¶¶ 8- 9.)  The JCC had every right to object and reject this option under the Bond, and F&D does not challenge this action.  (*See* doc. # 29 at 6 n.2.)

F&D then moved to the next option, under Paragraph 4.2, which allowed F&D to take over and direct performance of the contract, either through independent contractors or otherwise.  (Pl. Exh. A ¶ 4.2.)   F&D presented its intention to utilize this option in the Takeover Agreement given to the JCC.  (*See* Pl. Exh. F.)  Under this option, F&D proposed that Yates would undertake to complete the Project and that F&D would assume primary responsibility for completion in accordance with the plans and specifications.  (*See id.*)  The JCC, however, rejected this option because of its concern that Yates would actually use EMR to complete the Project or some portion thereof.

14

When the JCC rejected the Takeover Agreement and refused to allow F&D to take over and complete the work under Paragraph 4.2 of the Bond, its actions constituted a material breach of the Performance Bond, thus relieving F&D of any obligations under the Bond. Paragraph 4.2 contains no provision requiring consent of the project owner as to the completion contractor. In proceeding under Paragraph 4.2, F&D sought to "[u]ndertake to perform and complete the Construction Contract itself, through its agents or through independent contractors." By its express terms, Paragraph 4.2 places no restrictions on whom F&D can use to complete the project. *See St. Paul Fire & Marine Ins. Co. v. Green River*, 93 F.Supp.2d 1170, 1177 (D. Wyo. 2000), aff'd 6 F. Appx. 828 (10th Cir. 2001) (construing identical provision of performance bond and concluding that under Paragraph 4.2 "it is clear that there are no limitations on who [the surety] could utilize to complete the Project.").

In stark contract, Paragraphs 4.1 and 4.3 both expressly require F&D to obtain the JCC's consent as to the completion contractor. The absence of the consent requirement in Paragraph 4.2 and the presence of such a requirement in Paragraphs 4.1 and 4.3 sensibly reflect the different obligations assumed by the surety electing to proceed under each of the provisions. In choosing to proceed under Paragraph 4.2, which requires the surety to undertake to perform and complete the construction contract, F&D "assumed the primary responsibility to complete the contract, and with

15

that responsibility came the freedom to assemble the project team of its choosing."

*Green River*, 93 F. Supp.2d at 1177; *see also* Richard S. Wisner & James A. Knox,

Jr., *The ABC's of Contractors' Surety Bonds*, 82 Ill. B.J. 244, 246 (1994) (explaining

that when a surety elects to take over and complete the project, it directly assumes the

contractor's underlying contractual obligation to complete the project).   Thus,

"[w]hile it makes sense that the owner would have the right to object to such a

'shotgun wedding' to the contractor it just terminated . . . , it does not have this right

when the surety assumes primary contractual responsibility [under Paragraph 4.2]."

*Green River*, 93 F. Supp.2d at 1177.   As such, the JCC breached the Performance

Bond when it did not allow F&D to proceed under Paragraph 4.2 and the Takeover

Agreement.

   The JCC contends, however, that the Bond incorporates the construction

contract by reference, and the construction contract "contains additional provisions

which are contrary to the performance bond."  (Doc. #37 at 4.)  According to the JCC,

those provisions[9] permitted JCC to terminate EMR and retain Mowery to complete

_____

   [9] The provisions highlighted by the JCC include the following:

   •    Sections 12.2.1 and 12.2.4 which make EMR liable to the JCC for the cost
        of correcting defective work;
   •    Section 14.2.4 which provides that EMR is liable for the cost of
        completing the work;
   •    Section 2.4.1 which provides that the JCC may undertake corrective action
        "without prejudice to other remedies the Owner may have"

the work EMR was initially retained to complete."   (Doc. #37 at 4.)   More

specifically, the JCC argues as follows:

> FDC['s argument] . . . completely ignores the terms
> incorporated into the performance bond which are
> contained in the "Contract for Construction".   The
> "General Conditions of the Contract for Construction"
> which was entered into between EMR and JCC
> specifically makes EMR liable to JCC for the cost of
> correcting any and all defective work pursuant to §§12.2.1
> and 12.2.4.  Likewise, §14.2.4 of the "Contract for
> Construction" makes EMR liable to JCC for the cost of
> completing the work that EMR had contracted to perform.
> Perhaps even more significant to FDC, the "Contract for
> Construction" does not require notice to FDC for any of the
> foregoing actions to occur.

(Doc. #37 at 5.)

A generally accepted rule of contract law is that where a writing expressly

refers to and sufficiently describes another document, that other document should be

interpreted as part of the writing. *McDougle v. Silvernell*, 738 So.2d 806, 808 (Ala.

1999); *Ex parte Dan Tucker Auto Sales, Inc.*, 718 So.2d 33, 36 (Ala. 1998); 17

Am.Jur.2d Contracts § 400 (1991).   However, it is also a generally accepted rule that

when provisions of a contract appear to be in conflict, they should be reconciled, if

---

•   Section 14.2.3 permits the JCC owner to terminate a contractor "without prejudice to any other rights or remedies of the Owner, . . . [but] subject to any prior tights of the surety," and then to "finish the work by whatever reasonable method the Owner may deem expedient."

(Def. Ex. C.)

possible. *See Sullivan, Long & Hagerty v. Southern Elec. Generating Co.*, 667 So.2d 722, 725 (Ala. 1995). Indeed, an interpretation of a contract which gives a reasonable, lawful and effective meaning to all of the terms is preferred to an interpretation which leaves a part unreasonable, unlawful or with no effect. *See Board of Water & Sewer Comm'rs of City of Mobile v. Bill Harbert Constr. Co.*, 870 So.2d 699, 710 (Ala. 2003).

The court concludes that the default provisions of the Performance Bond and the termination provisions of the Construction Contract are not inconsistent, and one does not modify or overrule the other, as the JCC argues. Instead, a close reading of the Construction Contract reveals that after a termination for cause, the rights of the owner, here the JCC, to "finish the Work by whatever reasonable method the Owner may deem expedient" is "subject to any prior rights of the surety." (Def.'s Exh. C at 43, § 14.2.2) (emphasis added). Under Paragraph 4.2 of the Performance Bond, , a prior right of F&D was to take over the project and directly assume EMR's underlying contractual obligation to complete the project. Therefore, the JCC's argument that the Construction Contract somehow permitted their actions fails.

Additionally, in support of its argument that the incorporated contract modifies the Performance Bond, the JCC primarily relies upon *Dooley and Mack Constructors, Inc. v. Developers Surety and Indemnity Co.*, 972 So.2d 893 (Fla. 3d DCA 2008). In

18

that case, the Florida court held a provision of a subcontract that was incorporated into the performance bond overrode an explicit notice requirement of the bond.  To the extent that the logic in *Dooley* applies to this case, however, the court rejects it. Instead, like the district court in the Southern District of Florida, *see CC-Aventura, Inc. v. The Weitz Co., LLC*, 2008 WL 2937856, at *7 (S.D. Fla. July 14, 2008), the court is more persuaded by the reasoning of the dissent in *Dooley*:

> The majority . . . seizes upon an obscure provision of the subcontract agreement, not signed by the surety, to afford [the contractor] a remedy not contemplated either in the default provision of the subcontract or the bond. . . .  The majority's interpretation of the agreements in this case effectively converts the bond into an insurance policy.

*Id.* at 895-96 (J. Shepherd, dissenting).  As further explained by the *Dooley* dissent, the bond is necessarily the primary determinant of any dispute between the owner and the surety for two reasons.  First, the contract for the work "usually precedes the issuance of the bond.  Renegotiation of a contract or subcontract to assuage any or every concern of the surety at this stage is impractical."   Second,

> [t]ypically the parties executing B141 [the official AIA architectural service agreement] may not have read, reviewed, or discussed A 201 [General Conditions of Contract] . . . Incorporation by reference of other, unseen documents that substantially change the parties' rights may be perceived as a dishonest or deceptive way to arrange for contractual terms that might not otherwise be acceptable to a party.

19

*Id.* at 899 (J. Shepherd, dissenting) (quoting one of the authors of the leading treatises on standard American Institute of Architects (AIA) construction documents).  Both of these explanations apply with equal force to the record before the court.

Although the JCC may have had the right under the construction contract to hire Mowery to complete the project, it did not have the right to do it without first allowing F&D to exercise its rights under the Performance Bond.  One of the express terms in the Bond was to accept a takeover by F&D, if that was the remedy chosen by F&D in the case of default by EMR.  When the JCC did not accept the takeover agreement and instead went outside the terms of the bond (and construction contract) and hired its own contractor to complete the Project, the JCC breached the terms of the bond.  As such, it is not entitled to any relief under the Bond.[10]

### B.  Covenant of Good Faith and Fair Dealing

In its Counterclaim, JCC alleges that F&D somehow breached the covenant of good faith and fair dealing through the takeover provision and the possible re-hire of EMR through Yates. (*See* docs. #31 at 8-10 & #37 at 8-10.)   Essentially, the JCC argues that it would have been much more difficult for it to complete the construction contract if EMR was hired as a subcontractor to Yates because of all the alleged

---

[10] Because resolution of this argument is determinative, the court does not address the additional arguments presented by F&D in favor of summary judgment.

problems the JCC experienced with EMR.  This argument is unavailing.  First and foremost, it is purely speculative.  Although there is some evidence in the record that Yates may have hired EMR to complete the project, this never occurred because of the actions of the JCC.  The court understands the concerns that the JCC would have if, in fact, EMR had been subcontracted to complete the job.  However, as discussed in detail above, under the provisions of Paragraph 4.2 and the takeover agreement, the ultimate responsibility to successfully complete the work would be with F&D, and, if anything had gone awry, the JCC could have sought recourse under the Performance Bond.   The argument by the JCC, however, completely ignores the language of the Performance Bond which expressly permits F&D to complete the project and assume primary responsibility under Paragraph 4.2.

Simply put, the JCC cannot "have its cake and eat it too."  After the default by EMR, the JCC made a demand on F&D to fulfill its obligations under the Bond.  However, when the JCC did not like the terms under which F&D chose to execute those obligations, it hired another contractor to complete the job and then sued F&D for breaching the Bond.  To enforce the Bond, however, the JCC had to work under the terms of the Bond and allow F&D to takeover responsibility of the elevator construction under Paragraph 4.2.  This it did not do, and it cannot now ask for relief

under the Bond.   As such, summary judgment is due to be granted in full in favor of F&D on the counterclaim of the JCC.

## V.  Conclusion

For the foregoing reasons, the court finds that no material issues of fact remain and that Plaintiff's motion (doc. # 24) for summary judgment is due to be granted in full and Defendant's motion (doc. #25) for summary judgment is due to be denied. A separate order will be entered.

**DONE** this the ___17th___ day of November, 2010.

_James N. Hancock_
SENIOR UNITED STATES DISTRICT JUDGE